Filed 11/29/23  In re R.C. CA4/2
See Concurring and Dissenting opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.C., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E080692 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1100280) |
| v. | OPINION |
| R.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.

Reversed.

Anna Rak, under appointment by the Court of Appeal, for Defendant and

Appellant.

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Prabhath Shettigar,

Deputy County Counsel, for Plaintiff and Respondent.

1

Father appeals from a judgment terminating his parental rights to R.C., pursuant to Welfare and Institutions Code[1], section 366.26. The child was born with extreme medical complications due to heroin withdrawal after being exposed to drugs in utero. Both mother and father had a history of using heroin and methamphetamine, for which reason mother had lost custody and failed to reunify with four older half siblings of R.C. The Riverside County Department of Public Social Services (DPSS or the Department) filed a dependency petition, and, at jurisdiction, mother was denied services, but services were offered for father.

Over the reunification period, father was slow to engage in services, which were terminated at a combined six- and 12-month review hearing where a section 366.26 hearing to select and implement a permanent plan of adoption was set. Father filed a motion to modify the order terminating services, some of which he completed after services were terminated, which was heard and denied at the selection and implementation hearing. Parental rights of both parents were terminated. Father appeals.

On appeal, father argues that (1) the juvenile court erred in denying his modification petition pursuant to section 388; and (2) the court and DPSS failed to conduct a proper inquiry into possible Indian ancestry. We conditionally reverse.

**BACKGROUND**

Because mother is not a party to this appeal, we limit our references to her to those matters needed for context.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

R.C. was born in June 2021 at 32 weeks gestation with serious medical problems related to being born prematurely with opioid withdrawal. Mother came into the emergency room seeking treatment, telling staff she did not care about the baby, and that they needed to save her. Mother was intubated due to breathing issues related to opioid withdrawal, and was in an induced coma, while R.C. also suffered from respiratory distress syndrome, as well as severe issues requiring a peripherally inserted central catheter (PICC) line, a spinal tap, and milk consent (because mother was unable to consent to treatment). Additionally, the baby was born with a small, poorly functioning kidney, requiring a catheter, and had jaundice, requiring light therapy.

Mother had a long history of using opioids and methamphetamines and had lost custody of four[2] older children (unrelated to this father) due to her substance abuse. A fifth child was stillborn. Mother identified two possible fathers, V.R. (her boyfriend) and R.B. Father R.B. fathered the stillborn infant. R.B. also had a long history of drug abuse, including methamphetamines and heroin, and earned money by committing theft related offenses. He also had an extensive criminal record of drug and theft related offenses. R.B. indicated he had been denied access to visit the infant in the hospital, so he requested paternity testing in order to visit.

When the child was ready for discharge, DPSS obtained a protective custody warrant and detained the child. On July 22, 2021, the Department filed a dependency

---

[2] Two of the older four children are in legal guardianships with relatives, while parental rights were terminated as to the other two, who were freed for adoption after mother failed to benefit from reunification services for drug use.

petition alleging the child came within the provisions of section 300, subdivisions (b)(1) and (g), based on the long history of drug use by mother and father R.B., as well as mother's prior child welfare history that had resulted in the loss of custody of her other children, including the termination of parental rights as to two children, and the unknown whereabouts of alleged father V.R., who was soon dismissed and stricken from the petition when DNA testing eliminated him as father.

At the detention hearing, the court ordered the child detained in foster care and authorized paternity testing for the two alleged fathers. The court denied visitation to both alleged fathers, finding visits would be detrimental because the men were alleged fathers only.

The jurisdiction/disposition report was submitted on August 11, 2021, recommending true findings on all the allegations, removal of R.C. from her parents' custody, denial of reunification services to mother pursuant to section 361.5, subdivision (b)(10), and denial of services to the alleged fathers. The report indicated that on June 14, 2021, father R.B. denied any Indian ancestry; on July 1, 2021, mother did likewise. The report did not include any information from R.B. regarding placement, because the social worker was unable to interview him. The report recommended denying services to both alleged fathers because neither had made themselves available for an interview.

On October 29, 2021, in another addendum report filed prior to the jurisdiction hearing, the social worker recommended reunification services for father R.B., whose DNA tests established he was the biological father. However, the social worker recommended that visits between R.B. and his daughter continue to be denied. During

4

the period between the detention and jurisdiction hearings, mother failed to submit drug tests, participate in drug treatment, or counseling. Mother also failed to visit the baby, although her cousin, who was seeking relative placement of R.C., did visit. Mother attributed some of her failures to Covid-19, indicating she was required to test negative for the virus three times before she could drug test. On October 25, 2021, the Resource Family Approval (RFA) Unit approved the maternal cousin for placement.

The Department filed an amended petition on November 3, 2021, striking the alleged father, V.R., and the allegation pursuant to section 300, subdivision (g), from the petition. On December 2, 2021, the caretakers of the child sought de facto parent status. On December 8, 2021, in another addendum report, the social worker continued to recommend reunification services for father but requested that visits with mother be denied. The report also noted that although the maternal cousin had been approved for relative placement, the cousin withdrew her request for placement due to changed circumstances. In the meantime, mother had not shown up for any drug tests and did not participate in any services.

On January 24, 2022, yet another addendum was filed (more than six months after the child was detained in the Department's custody), which for the first time recommended that father receive supervised visits. By this time, the social worker contacted paternal relatives, including the paternal grandmother, where father was supposed to be, learning that father had not been there for two days. The family was well aware of the drug use by mother and father, who used on the property where the paternal

grandmother lived, but indicated father had gotten treatment in the past and did well until he hooked up with mother and started using drugs again.

Eventually, father contacted the social worker and indicated he had called a substance abuse program to deal with his habit. Father admitted he used heroin twice a day and also used methamphetamines and marijuana. However, father had failed to show up for a drug test when directed, and the results of a recent test had not been received.

On January 27, 2022, the court conducted a combined jurisdiction/disposition hearing. The court made true findings on all the allegations under section 300, subdivision (b)(1), and struck the allegation under section 300, subdivision (g). The court removed custody from the parents, denied services for mother, but granted services for father. The court found that ICWA did not apply. The court also granted the de facto parent application.

In the six-month status review report, the Department recommended terminating services for father, reducing his visits, and setting the matter for a selection and implementation hearing under section 366.26. The report reflected that ICWA did not apply based on the finding made at the jurisdictional/dispositional hearing and based on an inquiry of father made on March 22, 2022, in which he denied any tribal ancestry or membership. At this time, mother's whereabouts were unknown, so no further inquiry could be made of her.

Father had been charged with a new criminal offense during this reporting period, and a hearing on an alleged violation of probation was pending. He was interested in an in-patient treatment program, so the social worker sent him referrals. In April 2022, he

entered the MFI Recovery Center, but he left after approximately one week. The social worker sent an additional referral, after which father indicated he had entered Victory Outreach, but he left after a few weeks. While there, father tested negative for drugs on one test, but did not show up for a second. Additional referrals were provided, and father initiated counseling services. Father then started an outpatient drug treatment program.

In the meantime, father had visited the child three times, all of which were appropriate. Because father had just begun drug treatment and counseling, and because he had pending criminal charges, the social worker recommended a finding that return to father would be detrimental and that services be terminated.

The six-month review hearing was continued because mother's counsel declared a conflict. Shortly thereafter, father submitted certificates of completion relating to a relapse prevention program, a substance abuse program, and parenting classes; he also submitted a sentencing memorandum regarding the criminal charges showing he had been placed on summary probation.

On August 10, 2022, the Department submitted a combined six-month and 12-month status review report, containing the same recommendations as had been made in the prior report. The report also recommended a finding that ICWA does not apply, although no additional inquiries appear to have been made. The report indicated father was living with a friend awaiting placement in a sober living program. Father had obtained full time employment at a warehouse. Father's substance abuse program was ongoing, and he was in compliance; however, father had only attended a few counseling sessions, had missed a therapy session, and had just begun attending a parenting

7

education program. Father submitted a hair follicle test for controlled substances and had visited with R.C. seven time since his visits were initiated, canceling, or failing to schedule a visit, on five occasions. On August 22, 2022, the social worker filed an addendum report to inform the court father's hair follicle test was negative for all controlled substances. The report was accompanied by two more certificates showing father had completed substance abuse and parenting classes.

On August 25, 2022, the court conducted the review hearing; it found ICWA did not apply, that father had made minimal progress, and that return of the child to father would be detrimental. The court terminated reunification services and set a selection and implementation hearing under section 366.26, reducing father's visits to one time per month.

On December 12, 2022, the social worker submitted a report for the section 366.26 hearing, recommending termination of parental rights of both parents. The father maintained monthly visits, missing only one, and the caretakers were committed to adopting the child and were open to maintaining contact between father and the child. On January 27, 2023, father filed a section 388 request to modify a prior order (Judicial Council Forms, form JV-180), seeking to reinstate reunification services. The petition alleged father completed his outpatient program and was currently enrolled in recovery services, an optional program to support recovery. In addition, he drug tested weekly and all tests were negative. Further, he had stable housing. The court set the hearing in connection with the pending section 366.26 hearing.

In response to father's petition, the Department submitted an addendum report recommending denial of the petition. The report confirmed father had completed the substance abuse program and had tested negative but indicated he had completed minimal counseling sessions and had not shown any benefit from counseling or parenting classes. The report also acknowledged father had visited regularly but that the child was not bonded to him: frequently the child refused to go to him at visits, and during visits, she spent most of her time with the caretakers. The Department recommended that the modification petition be denied.

On February 8, 2023, the court denied father's modification petition and terminated parental rights of both parents, freeing the child for adoption, and designating the de facto parents as the prospective adoptive parents. On February 14, 2023, father timely appealed.

## DISCUSSION

1. *Whether the Court Abused Discretion in Denying Father's Petition to Modify the Prior Court Order.*

A juvenile court order may be changed, modified, or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 316-317.) The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529 (*Kimberly F.*).) "Generally, the petitioner must show by a

9

preponderance of the evidence that the child's welfare requires the modification sought." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)

In evaluating whether the petitioner has met the burden to show changed circumstances, the trial court should consider: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) The juvenile court may also consider the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616; see *Kimberly F.*, *supra*, at pp. 530-532.)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Moreover, once reunification services are ordered terminated or bypassed, the focus shifts from reunification to the child's need for permanency and stability, and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526-527.)

10

Further, to establish a prima facie basis for modification, the parent must show circumstances have changed, not merely that they are in the process of changing. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The change "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485.) Showing that circumstances are in the process of changing is insufficient because of the interest in promoting stability for the child, a concern that is heightened in cases like this where the child is of very young age. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358; *In re Casey D.*, *supra*, at p. 47.)

The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

We recognize the difficulty of establishing a change of a parent's circumstances where the problems that led to the dependency relate to chronic drug abuse, as was the case here. (See *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, fn. 9 ["[i]t is the nature of addiction that one must be 'clean' for a much longer period . . . to show real reform"]; see also *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [no changed circumstances where "recent efforts at rehabilitation were only three months old at the time of the section 366.26 hearing"].) That is due to the persistent nature of drug addiction, particularly with drugs like heroin and methamphetamines. Relapse is common, even after months of

sobriety, and a return to drug use can throw a child back into circumstances of neglect and abuse.

Here, father's efforts at rehabilitation are truly laudable, but his recovery was still "young," insofar as his sobriety had not been sustained long enough to show his situation was duly changed, rather than changing. With a very young child like R.C., we must be mindful that childhood does not wait for the parent to become adequate. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627; *In re Marilyn H., supra*, 5 Cal.4th at p. 308; see also, *In re C.W.* (2019) 33 Cal.App.5th 835, 839.) Father had received 12 months of services but had not established the sustained sobriety that would support a finding of changed circumstances.

For this reason, while we commend father's efforts, we conclude the juvenile court did not abuse its discretion in denying the requested modification.

2. *Whether the Court and DPSS Properly Discharged the Duty of Continuing Inquiry into Possible Indian Ancestry.*

Father also argues the Department failed to inquire of relatives whether there was Indian ancestry. DPSS, which acknowledges that no inquiry was made of relatives, argues there was and is no duty to inquire of relatives because the child was detained based on protective custody warrants, so the inquiry provisions of section 224.2, subdivision (b), were not triggered, relying upon the recent case out of our division, *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 (*Robert F.*). We disagree with that approach and conclude the duty of inquiry begins when the children are received by DPSS, by whatever means.

12

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C., §§ 1911, subd. (c), 1914; see Welf. & Inst. Code, § 224, subd. (e)).

Under California law, the juvenile courts and the child protective agencies, "(but not parents)[, have] an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742, quoting § 224.2, subd. (a).) "That duty to inquire begins with [the] initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)-(c).) Section 224.2, subdivision (a), expressly states the duty to inquire is *not limited* to asking the reporting party if they have information that the child may be an Indian child. Section 224.2, subdivision (b), requires the department to ask extended relatives where "a child is placed into the temporary custody of a county welfare department pursuant to Section 306." Section 306, subdivision (b), requires departmental inquiry into Indian

13

heritage pursuant to section 224.2, "[u]pon receiving temporary custody of a child." "Under both ICWA and California law, '"extended family member[s]"' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' [Citations.]" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053; see also, *In re Dominick D*. (2022) 82 Cal.App.5th 560, 567.) Upon each party's first appearance in a dependency proceeding, the juvenile court must ask each participant "whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent . . . to complete [an ICWA-020 form]." (Cal. Rules of Court, rule 5.481(a)(2)(C).)

"The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The initial contact refers to the first in-person contact between DPSS and the family following a referral to investigate for child abuse or neglect. (See Child Welfare Services, *Manual of Policies and Procedures*, §§ 31-125.1, 32-127.1 [describing the social worker's investigatory duties of in-person contact to assess risk upon receiving a referral for suspected abuse or neglect].)

Removal of a child from his parents is the true triggering event, because ICWA is not involved in juvenile dependency proceedings where a child remains placed with his

14

parent or parents. The language of ICWA specifically states that it applies when a child is placed in foster care or an adoptive placement: "The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards *for the removal of Indian children from their families and the placement of such children in foster or adoptive homes* which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs. (25 U.S.C. § 1902, italics added.)

Not every child is removed at the time of "initial contact." A peace officer may take a child or children into temporary custody without a warrant, based on probable cause to believe the child is a person coming under the definition of a dependent child, or when the child is in apparent need of protection from harm. (See § 305.) Once taken into temporary custody, the peace officer must try to contact the parent or guardian, and, if the parent or guardian cannot be contacted, the peace officer shall notify a social worker in the county welfare department to assume custody of the child. (§ 305, subd. (a).) When delivered to the social services agency, a social worker must receive and maintain, pending investigation, temporary custody of a child who is described in section 300, and who has been delivered by a peace officer. (§ 306, subd. (a).)

An initial contact may also occur when the social services agency receives a referral for suspected abuse or neglect, investigates the referral, and determines that the child has an immediate need for medical care or is in immediate danger of physical or

sexual abuse or the physical environment poses an immediate threat to the child's health or safety. In such situations, a social worker may take the child into custody and detain him or her without a warrant. (§ 306, subd. (a)(2).)

A child may also be taken into temporary custody by means of a protective custody warrant, where there is no emergency situation requiring immediate removal. (§ 340.) In any of these situations, the child is "received" by the agency, and "[u]pon receiving temporary custody of a child, the county welfare department shall inquire pursuant to Section 224.2, whether the child is an Indian child." (§ 306, subd. (b).)

Some recent published decisions have concluded that the duty of inquiry of extended relatives is limited to situations in which the social services agency takes the child into custody without a warrant. (See *Robert F.*, *supra*, 90 Cal.App.5th 492, relying upon *In re Adrian L.* (2022) 86 Cal.App.5th 342, 364 (conc. opn. of Kelley, J.); see *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-678, review granted July 26, 2023, S280572.) However, each of these decisions misinterprets the language of section 224.2, subdivision (b), without considering section 306 in its entirety. The reference to section 306 in section 224.2, subdivision (b), is general and does not limit the duty of inquiry to any specific subdivision of section 306. Instead, section 306, subdivision (b), provides, without limitation "Upon receiving temporary custody of a child, the county welfare department shall inquire pursuant to Section 224.2, whether the child is an Indian child."

Yet *Robert F.*, on which *In re Ja.O.* relies, incorrectly states that "Section 306 authorizes county welfare departments to take children into temporary custody 'without a

16

warrant' in certain circumstances. (§ 306, subd. (a)(2).)" (*Robert F.*, *supra*, 90 Cal.App.5th at p. 497.) The statute contains no such language. The decision then goes on to hold that the duty to inquire of extended family is limited to children received by the department in that circumstance. We disagree with this analysis.

Section 306, subdivision (a)(2), is simply a description of one of the various means in which the department assumes responsibility to temporarily place and care for a child who is removed from his or her parents. The Legislature described situations in which a social worker, responding to an emergency referral, initiates a contact and determines that immediate removal of a child is necessary, from situations in which a peace officer delivers a child to the Department. Reading the entire statute, it broadly describes the social services agency's authority to receive and maintain a child in temporary custody, and its duty to inquire about possible Indian heritage. By relying on the language of a single subsection of section 306, that is, subdivision (a)(2), to reach their conclusions, the conclusions of *Robert F.* and *Ja.O.* ignore the rest of section 306. Yet section 224.2, subdivision (b), refers generally to section 306. There is no language limiting the application of section 224.2 to situations arising under section 306, subdivision (a)(2), as the cases suggest.

Section 306, subdivision (a), covers situations in which the social worker receives a child pending investigation, who was delivered by a peace officer. (§ 306, subd. (a)(1).) Children removed pursuant to a warrant are similarly "received" by the Department when a peace officer executes a protective custody warrant and delivers a

17

child to the Department. (§ 340, subd. (c).) In other words, use of language in section 306 referring to the department's receipt of a child into its temporary care indicates a legislative intent not to exclude or limit the application of section 306 to any single type of situation. When a child is received by the agency, the duty of inquiry is triggered.

Because the duty to inquire of extended relatives pursuant to section 224.2, subdivision (b), applies to children who are received by the Department by the means described in section 306, that condition is met when a child is picked up by peace officers pursuant to a protective custody warrant and is "delivered" to the Department, which then "receives" the child pursuant to section 306, subdivision (a)(1).

The express language of section 306, subdivision (a)(1), covers situations in which the Department "receives" a child who is delivered by a peace officer upon the execution of a protective custody warrant that was issued pursuant to section 340, and does not exclude children taken into custody pursuant to a protective custody warrant. Therefore, children detained upon the execution of a protective custody warrant are delivered to the social worker within the meaning of section 306, subdivision (a)(1), whereupon the duty of inquiry into Indian ancestry is triggered.

In our view, section 306, subdivision (a)(2), authorizing a social worker to immediately "take into and maintain temporary custody of, without a warrant" is intended to serve the obvious purpose of permitting the social worker to act quickly in the face of exigent circumstances, without the necessity of seeking a pre-petition warrant, or waiting until the initial hearing on the petition, where an emergency is present. Nothing

18

in the statute reflects that the Legislature intended to limit the duty of inquiry to such situations. Indeed, such an interpretation would directly contravene the express provisions of ICWA itself, which applies to any removal of an Indian child from the custody of a parent, where the child will be placed in foster or adoptive placement.

It is the delivery of the child to the Department that triggers section 306, subdivisions (a)(1) and (b), which, in turn, trigger the duty of inquiry pursuant to section 224.2, subdivision (b). Thus, the fact the child was detained upon a warrant does not give rise to a lesser duty of inquiry into Indian ancestry. We therefore adopt the reasoning of *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted September 27, 2023, S281447, where another panel of this court determined that the duty of inquiry of extended relatives is triggered whenever the social services agency receives a child and maintains temporary custody.

The Department's interpretation of section 224.2, subdivision (b), as followed in the recent case of *Robert F.*, would frustrate the legislative intent, which is to ensure a continuing, full, and complete inquiry respecting possible Indian heritage of children removed from parents' custody, contrary to the Department's suggestion. While neither parent claimed any Indian ancestry at the detention hearing, this did not relieve the Department of its duty to inquire into possible Indian ancestry as "parents may not know their possible relationship with or connection to an Indian tribe." (*In re Y.W.* (2021) 70 Cal.App.5th 542, 554; see *In re Breanna S.* (2017) 8 Cal.App.5th 636, 650.)

19

Here, the Department interviewed both grandmothers and other relatives in the initial stages of the dependency.[3] Asking family members about possible Indian heritage while also inquiring of relatives about the parents' family history, is not an undue burden. We remand the matter to conduct an inquiry of relatives as to possible Indian heritage.

**DISPOSITION**

The order terminating parental rights is conditionally reversed. On remand, the juvenile court shall order the Department to comply with the duty of initial inquiry (Welf. & Inst. Code, § 224.2, subd. (b)) and, if and when applicable, the duty of further inquiry (Welf. & Inst. Code, § 224.2, subd. (e)) and the duty to provide notice to the pertinent tribes (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3). If the juvenile court determines that ICWA does not apply, then the court shall reinstate the order terminating parental rights. If the court determines that ICWA applies, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

I concur:

RAPHAEL
J.

---

[3] We are aware that the maternal grandmother is now deceased after contracting Covid-19, but the maternal cousin, who was initially considered for relative placement, is available.

20

[*In re R.C.*, E080692]

FIELDS, J., Concurring and Dissenting.

I fully concur in the majority's decision in this case except its holding determining that an inadequate ICWA inquiry occurred below and its adoption of the reasoning and holding of this court's decision in *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted September 27, 2023, S281447, regarding the scope of the ICWA inquiry required in this case.  I continue to agree with and follow this court's decisions on the ICWA inquiry question in *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572; and *In re Andres R.* (2023) 94 Cal.App.5th 828, 836, 840-860, review granted November 15, 2023, S282054.  Thus, I would affirm the decision of the juvenile court.

FIELDS _____
J.

1